HUMBLE NATIONAL BANK, Appellant,

v.

DCV, INC., Appellee.

No. 14–94–00959–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 29, 1996.

Rehearing Overruled Nov. 21, 1996.

Mariann Sears, John B. Thomas, Houston, Michael A. Hatchell, Molly H. Anderson, Tyler, for appellant.

Kenneth R. Wynne, Mark Maney, Gregory A. Pierce, Houston, for appellee.

Before YATES, AMIDEI and O'NEILL, JJ.

## OPINION

O'NEILL, Justice.

DCV, Inc. ("DCV"), appellee, filed suit against Humble National Bank ("the Bank"), appellant, alleging breach of contract, conversion, negligence, and violations of the Texas Deceptive Trade Practices Act (DTPA). Following a jury trial, the trial court entered judgment for DCV based upon the jury's finding that the Bank breached an express warranty under the DTPA. The Bank brings thirteen points of error alleging that (1) DCV's claims under the DTPA are barred by the statute of limitations, (2) the trial court erred in entering judgment on the express warranty claim, (3) the trial court erred in awarding damages on the express warranty claim, and (4) the trial court improperly failed to condition its award of appellate attorney's fees. DCV brings a cross-point complaining about the trial court's award of prejudgment interest, and eleven conditional cross-points in the event it does not prevail on the express warranty issue. We reverse and remand to the trial court for further action in accordance with this opinion.

## Background

DCV, Inc. is the assumed name of Antipode Valve Specialty Company, Inc., a small Houston company that sells specialty valves to the chemical industry. The company was originally formed by Clyde "Jon" Carr and was known as A–Line Company. The company was later taken over and operated by James Denson, who ultimately gave forty-nine percent of the company back to Jon Carr. The Bank had a banking relationship with DCV and the predecessor company.

DCV employed an outside bookkeeper, John Bingman. Bingman had originally been hired when the company was known as A–Line Company to set up and customize a computer accounting system for the company. Bingman's duties were later expanded to include all of the accounting, cutting checks, preparing income tax returns, paying payroll taxes, balancing the bank statements, making deposits, and taking checks to the Bank to pay taxes.

In 1988, Bingman began stealing from DCV. Bingman would prepare a DCV company check payable to "Humble National Bank," obtain an authorized signature on the check, usually Denson's, and take the check to the Bank. Instead of directing the Bank to pay taxes with the check as he was instructed to do, Bingman would discard DCV's written instructions and prepare a cashier's check request slip instructing the Bank to exchange the DCV check for a cashier's check payable to ABCA, Inc., a company created by Bingman. The Bank would exchange the company check for a cashier's check and deduct the money from DCV's account. Bingman would then endorse the cashier's check and deposit it in his ABCA, Inc. account at a different bank.

Denson first learned of Bingman's scheme when he began preparations for his retirement. Denson sent the Social Security Administration a questionnaire requesting information on the amount of his social security draw upon retirement. The Administration responded that for the preceding three and one-half years no social security payments had been made on his behalf and no IRS withholding taxes had been paid. Bingman was confronted with this information and ultimately confessed to embezzling the money.

## Trial and Judgment

DCV filed suit against the Bank for its alleged part in Bingman's scheme. The case was tried to a jury, which answered "yes" to liability questions on breach of contract, negligence, breach of express warranty under the DTPA, and conversion.[1] The jury also

1. During trial the court granted the Bank's mo-

tion for directed verdict on DCV's claim for

found that (1) Bingman had "apparent authority" from DCV to direct the Bank to issue the cashier's checks, and (2) DCV was fifty percent negligent. Regarding the Bank's statute of limitations defense, the jury found DCV first learned of the Bank's alleged wrongful conduct after April 26, 1990, which was within the applicable limitations period.

DCV moved for judgment on the verdict and requested the court to enter judgment on the breach of express warranty finding. DCV requested a monetary award of $405,-815.80, together with attorney's fees and prejudgment interest at the rate of ten percent. The trial court determined that the findings on DCV's theories of recovery other than breach of express warranty were immaterial in light of the jury's finding of apparent authority, and granted the Bank's motion to disregard them.[2] On June 9, 1994, the trial court entered judgment in favor of DCV based upon the express warranty claim, and awarded DCV its attorney's fees and prejudgment interest at the rate of six percent.

#### Points of Error Four, Five and Seven

#### (Breach of Express Warranty)

In points of error four, five, and seven, the Bank claims the trial court should have disregarded the jury's answer to the breach of express warranty question because the evidence was legally and factually insufficient to support it. Under these points, the Bank argues: (1) the phrases "tradition of excellence" and "know your customer" did not rise to the level of a warranty; (2) there was no express warranty to provide reasonably proficient and safe and sound banking practices; and (3) there was no actionable warranty to

abide by the terms of the contract. We will address these contentions individually.

In its Fifth Amended Petition, the live pleading at the time of trial, DCV generally pled that the Bank's conduct violated the bank's implied and express warranties to provide reasonably proficient and safe and sound banking services. At trial, DCV relied upon the following purported express warranties: (1) the statement "a tradition of excellence" which appeared on the cover of the Bank's brochure; (2) the Bank's unwritten but highly promoted policy that it "knows its customer;" (3) that the Bank would provide reasonably proficient and safe and sound banking practices; and (4) that the Bank would abide by the contract terms.

■ The Bank claims these first two purported warranties are not actionable because they are merely opinion or puffing. Neither opinion nor puffing is specifically listed as a defense under the DTPA. *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 461 (Tex.App.— Dallas 1990), *writ denied per curiam*, 800 S.W.2d 853 (Tex.1991). *Compare* TEX. BUS. & COM.CODE ANN. § 2.313 (Vernon 1968) (statement of seller's opinion or commendation specifically listed as defense in Texas Uniform Commercial Code to the creation of an express warranty). While the DTPA does not specifically mention opinion or puffing as a defense, the Texas Supreme Court has held that "misrepresentations, so long as they are of a material fact and not merely 'puffing' or opinion, are nevertheless actionable [under section 17.46(b)(5) and (7) of the DTPA]." *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex.1980). Numerous courts of appeals and federal courts have followed *Pennington* and indicated that a "puffing" or "opinion" defense will defeat a misrepresentation claim brought under section 17.46(b)(5) and (7).[3]

---

breach of an implied warranty under the DTPA. That ruling forms the basis of DCV's conditional cross-point number eleven. The jury answered "no" to questions on: (1) violations of the DTPA relating to false, misleading or deceptive acts and unconscionable conduct; (2) malice; and (3) gross negligence.

**2.** The trial court's order disregarding the jury's findings on breach of contract, negligence and conversion is the subject of DCV's conditional cross-point numbers one, two, eight, nine and ten.

**3.** Section 17.46(b)(5) states that "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has sponsorship, approval, status, affiliation, or connection which he does not" is a false, misleading, or deceptive act or practice. TEX. BUS. & COM.CODE ANN. § 17.46(b)(5) (Vernon Supp. 1996). Section 17.46(b)(7) provides that "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"

*See, e.g., Presidio Enter., Inc. v. Warner Bros. Distrib. Corp.,* 784 F.2d 674, 686 (5th Cir.1986); *Sergeant Oil & Gas Co., Inc. v. Nat'l Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1362 (S.D.Tex.1994); *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 838–39 (Tex.App.—Amarillo 1993, writ denied); *RRTM Restaurant Corp. v. Keeping,* 766 S.W.2d 804, 807 (Tex.App.—Dallas 1988, writ denied); *Parks v. U.S. Home Corp.,* 652 S.W.2d 479, 484 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd w.o.j.).

■ Courts have generally considered three factors in determining whether a statement is actionable or mere puffing or opinion. *Hedley Feedlot,* 855 S.W.2d at 826. First, the court must examine the specificity of the alleged misrepresentation. *Id.* (citing *Autohaus,* 794 S.W.2d at 462). An imprecise or vague representation constitutes a mere opinion. *Id.* Although general or indefinite statements may support recovery under the DTPA, they must be examined in light of the particular facts of the case. *Id.* (citing *Autohaus,* 794 S.W.2d at 464). *But see Royal Business Machines, Inc. v. Lorraine Corp.,* 633 F.2d 34, 42 (7th Cir.1980) (holding general statements are generally regarded as expressions of seller's opinion or puffing and do not create an express warranty).

■ Second, courts compare the knowledge of the buyer and the seller. *Id.* (citing *Autohaus,* 794 S.W.2d at 463). As the Seventh Circuit stated in *Royal Business Machines,* whether a representation is a warranty or merely an expression of opinion depends in part upon whether the seller asserts a fact of which the buyer is ignorant, or merely states an opinion or judgment on a matter on which the seller has no special knowledge and on which the buyer may be expected to have an opinion and exercise his judgment. 633 F.2d at 41. While the Seventh Circuit describes this as a "decisive"

test, Texas courts merely consider the parties' comparative knowledge along with the specificity of the representation:

> Another circumstance which is treated as indicating whether a statement is a mere expression of opinion is whether or not its correctness is a matter of which either of the parties can judge as well as the other, upon which the buyer can, and may, reasonably be expected, in the exercise of ordinary diligence, to have formed his own opinion. . . .

> Superior knowledge of seller, in conjunction with the buyer's relative ignorance, operates to make the slightest divergence from mere praise into representations of fact effective as a warranty.

*United States Pipe & Foundry Co. v. City of Waco,* 130 Tex. 126, 108 S.W.2d 432, 436–37 (1937).

■ Finally, the courts look at whether the representation pertains to a past or current event or condition, or to a future event or condition. *Hedley Feedlot,* 855 S.W.2d at 839. Misrepresentations concerning future conditions or performance of a good or service are actionable under the DTPA. *See Smith v. Baldwin,* 611 S.W.2d 611, 615–16 (Tex.1980). A general statement concerning a future event, however, should be looked at differently than a statement concerning a past or present event or condition. *Autohaus,* 794 S.W.2d at 464.

■ We will first address whether the "tradition of excellence" and "we know our customer" representations are sufficiently specific to create an actionable warranty under the DTPA. *See id.* In dealing with an alleged misrepresentation under section 17.46(b), the Texas Supreme Court has stated that the DTPA prohibits false general representations as well as more specific misrepresentations. *Pennington,* 606 S.W.2d at 687. This language might be taken to mean

---

is a false, misleading or deceptive act or practice. All of the cases which talk about opinion or puffing as a defense under the DTPA are cases where the plaintiff brought claims under one or both of these sections. As a result, DCV claims these cases are inapplicable because DCV's claim is based on breach of express warranty under section 17.50(a)(2) of the DTPA and not misrepresentation. We disagree. We can find no logi-

cal reason to allow the defense of opinion or puffing in cases involving section 17.46(b), but exclude it from claims brought under section 17.50(a)(2). Further, section 17.50 itself states that a consumer may maintain an action where any act under section 17.46(b) or a breach of express warranty is a producing cause of damages. Tᴇx. Bᴜs. & Cᴏᴍ.Cᴏᴅᴇ Aɴɴ. § 17.50(a)(1) and (2)(Vernon 1987).

that all general statements may form the basis of a claim under the DTPA; however, we believe a better course of action is to examine each general statement in the context of its particular fact situation. *See Autohaus,* 794 S.W.2d at 464.

In the present case, the statement "A Tradition of Excellence" appeared on the front of the Bank's brochure containing information about rules and regulations governing the Bank's relationship with its depositors. The phrase "A Tradition of Excellence" is a slogan that any commercial enterprise might adopt, and is so vague and general that it is impossible to know what is expressly warranted. It is not a "positive averment of fact" describing the Bank's capabilities to which an express warranty would attach. *Royal Business,* 633 F.2d at 41. Although James Smith, a vice-president of the Bank, testified that he represented to customers that the Bank observes a "tradition of excellence," there is nothing in this testimony that would overcome the vague and general nature of the statement. We find this phrase is merely an opinion regarding the reputation of the Bank in general, and do not find it to be a representation or warranty as to specific services to be performed in the future.

Likewise, we find that the Bank's policy of "knowing its customers" lacks the specificity required to create an actionable warranty under the DTPA. James Smith testified that "knowing the customer" was a "real key" to the Bank's operation and he communicated this idea to DCV. In his testimony, Smith further defined the phrase "knowing your customer" as "simply an attitude . . . when people walk in, you know who they are, you recognize them, and hopefully you know their name . . . so it's not a cold place to do business." Such a policy is often promoted in many service oriented operations, and is not sufficiently specific regarding the services to be performed so as to constitute a "positive averment of fact" to which an express warranty would attach.

DCV argues the Bank had superior knowledge about whether its services and procedures were "excellent" and whether it "knew its customer." DCV claims it could not have known the quality of the Bank's services when it opened the account. We agree that the Bank would be in a superior position to have knowledge regarding its banking policies, services, and procedures, but this factor alone is insufficient to overcome the vague and general nature of these alleged representations. DCV's claims and evidence do not satisfy the threshold determination of specificity required to create an actionable warranty under the DTPA. *See Autohaus,* 794 S.W.2d at 464. We hold that the Bank's slogan "A Tradition of Excellence" and its policy of "knowing its customers" are mere opinion or puffing, and cannot form the basis of an express warranty under the DTPA.

Next, the Bank complains there was no evidence that it warranted to provide reasonably proficient and safe and sound banking practices. DCV argues that this warranty is contemplated by the description of services contained in the Bank's brochure. We first note that there are no true DTPA warranties, nor does the DTPA define the term "warranty." [4] To be actionable under the DTPA, a warranty must be established "independently of the act." *Enterprise–Laredo Assoc. v. Hachar's, Inc.,* 839 S.W.2d 822, 830 (Tex.App.—San Antonio 1992), *writ denied per curiam,* 843 S.W.2d 476 (Tex.1992) (quoting *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 (Tex.1984)).

There was no evidence that the Bank represented to DCV that it would provide reasonably proficient banking services, nor is there anything in the agreement between DCV and the Bank to support such an express warranty. DCV does not present the "affirmations" it claims support this express warranty. Such a warranty could only be *implied* from the agreement between the Bank and DCV. Because the trial court directed a verdict in favor of the Bank on the issue of implied warranty under the DTPA, DCV cannot now claim that an *implied* warranty supports the jury's finding of an *express* warranty under the DTPA. We find

---

4. Several courts have noted this lapse in the DTPA, and have commented that it is unfortunate because the meaning of "warranty" at common law is ambiguous. *See, e.g., La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 n. 4 (Tex.1984).

no evidence to support the existence of an express warranty to provide reasonably proficient banking services.

■ Finally, the Bank claims there is no actionable warranty "to abide by the contract terms." The Bank argues this claim by DCV is "a desperate attempt to make every line in a written contract a warranty." The Bank claims that if DCV is allowed to prevail on this "warranty," all distinctions between a contractual promise and a warranty would be eliminated. DCV counters that the Bank represented "a number of matters regarding the services it wished to sell DCV, all of which failed to occur." DCV claims the Bank's descriptions of its services constituted warranties that the Bank's services would conform to the description. Specifically, DCV points to the Bank's contractual promise to hold DCV's funds and disburse them in accordance with DCV's authorized instructions. DCV claims the Bank described this service in its depository contract as follows:

> We reserve the right to require the governing body of the legal entity to give us a separate authorization telling us who is authorized to act on its behalf. *We will honor such an authorization until we actually receive written notice of a change from the governing body.*

(emphasis added). DCV claims this "description," particularly the last sentence, is an express warranty, the breach of which entitles DCV to recover under the DTPA.

In support of its position, DCV cites *Southwestern Bell Telephone v. FDP Corp.,* 811 S.W.2d 572 (Tex.1990). In that case, a Southwestern Bell representative met with the plaintiff to discuss advertising in the upcoming edition of the Houston Yellow Pages. When the plaintiff complained that a previous ad had contained an error, the representative assured plaintiff the new ad would be published correctly. The parties then executed a written advertising contract that called for various listings of plaintiff's company and a display. When the Yellow Pages was published, the listings appeared without error but the display was missing. Plaintiff brought suit against Southwestern Bell, alleging various causes of action under the DTPA. Bell's position was that there was no express warranty and plaintiff's only remedy was breach of contract. The jury failed to find that the omission of the display was caused by Bell's negligence, that Bell committed any "laundry list" violations under the DTPA, or that Bell had engaged in any unconscionable action, but did find that Bell breached its express warranty to publish plaintiff's advertisement.

In deciding whether the plaintiff's allegations stated a claim for breach of warranty under the DTPA or merely a claim for breach of contract, the Texas Supreme Court reviewed the history of the common law of warranty and determined that the Uniform Commercial Code (UCC) essentially codified the common law. *Id.* (citing Tex. Bus & Com.Code Ann. § 1.103). The Court emphasized the UCC's recognition that breach of contract and breach of warranty are not the same cause of action. *Id.* at 576. The remedies for breach of contract are set forth in section 2.711, and are available to a buyer when the seller fails to deliver. *Id.*; *see* Tex. Bus. & Com.Code Ann. § 2.711(a) (Tex. UCC) (Vernon 1994). The remedies for breach of warranty are in a different section, and are available when a buyer who has accepted goods discovers that the goods are defective in some manner. *Id.*; *see* Tex. Bus. & Com. Code Ann. § 2.714 (Tex. UCC) (Vernon 1994). The whole purpose of the law of warranty is to determine what it is the seller has in essence agreed to sell. *Id.* (citing Tex. Bus. & Com.Code Ann. § 2.313 (comment 4) (Tex. UCC) (Vernon 1994)). The supreme court found no reason to apply a different standard when the contract is for services instead of goods, and concluded that "in light of the ... purpose and rationale for warranty liability," Southwestern Bell's omission of the display was a defect in the performance of its advertising contract. *Id.* at 576. "[Plaintiff] purchased a package of advertising service; Bell delivered most of the services it agreed to provide, but by omitting a critical item, it delivered an incomplete package." *Id.* Thus, the court found there was some evidence to support the jury's finding that the defect in Bell's performance consti-

tuted a breach of its warranty to publish plaintiff's advertising correctly.[5] *Id.*

■ On the other hand, it is well-established that a mere breach of contract, without more, does not violate the DTPA. *Ashford Dev., Inc. v. USLife Real Estate Services Corp.,* 661 S.W.2d 933, 935 (Tex. 1983); *Enterprise–Laredo v. Hachar's,* 839 S.W.2d 822, 830 (Tex.App.—San Antonio 1992), *writ denied per curiam,* 843 S.W.2d 476 (Tex.1992) (quoting *McCrea v. Cubilla Condominium Corp. N.V.,* 685 S.W.2d 755, 757 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)); *Helms v. Southwestern Bell Tel. Co.,* 794 F.2d 188, 191 (5th Cir. 1986); *Dura–Wood Treating Co. v. Century Forest Indus.,* 675 F.2d 745, 756 (5th Cir.), *cert. denied,* 459 U.S. 865, 103 S.Ct. 144, 74 L.Ed.2d 122 (1982). We must first decide whether the Bank's contractual promise to hold DCV's funds and disburse them in accordance with DCV's authorized instructions created an express warranty.

■ As already stated, there are no true DTPA warranties, nor does the DTPA define the term "warranty." *Enterprise–Laredo Assoc. v. Hachar's, Inc.,* 839 S.W.2d at 830 (citing *La Sara Grain,* 673 S.W.2d at 565). To be actionable under the DTPA, the warranty must be established independently of the Act. *Id.* An express warranty is created when "a seller makes an affirmation of fact or a promise to the purchaser, which relates to the sale and warrants a conformity to the affirmation as promised." *Id.* (citing *McCrea v. Cubilla Condominium Corp., N.V.,* 685 S.W.2d 755, 757 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)).

Although express warranties are enforced in service transactions, warranty law has developed primarily within the context of the sale of goods. *Southwestern Bell Telephone v. FDP Corp.,* 811 S.W.2d at 574. Therefore, in determining when a fact or promise becomes part of the basis of the bargain, we may look to section 2.313 of the Texas Business and Commerce Code, which concerns express warranties and the sale of goods. *Id.* (holding that reference to the Texas Busi-

ness and Commerce Code is instructive in cases involving service transactions). *See also* TEX. BUS. & COM.CODE ANN. § 2.313, cmt. 2 (Tex. UCC) (Vernon 1994) (stating that although section 2.313 is limited in scope and purpose to warranties by seller to buyer as part of a contract for sale, the warranty sections of the article need not be confined to sales contracts and may offer useful guidance in other cases).

Section 2.313 states that any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. TEX. BUS. & COM.CODE ANN. § 2.313 (Tex. UCC) (Vernon 1994). This warranty has been defined as "any representation of fact or promise as to the title, quality, or condition of existing or future goods or services." *Enterprise–Laredo,* 839 S.W.2d at 830 (quoting Michael Curry, *Common Law Warranties,* STATE BAR OF TEXAS, ADVANCED DTPA CONSUMER LAW SEMINAR, I–7 to I–8 (1989)).

In *Enterprise–Laredo,* the San Antonio Court of Appeals examined whether the following rider to a commercial lease created an express warranty:

> Landlord warrants that Tenant shall not be required to pay a charge for the use of common areas and common facilities greater on a square footage basis than that [required to be] paid by any other Mall Tenant.

*Id.* at 830. Even though the rider contained the formal word "warrant," the court held that the contractual language did not create an express warranty because it simply referred to the basis on which the common area maintenance charge was to be calculated, "and did not relate to the character, quality, or title of the leased space which was the subject of the agreement." *Id.* at 831. The court stated that use of form words such as "warranty" or "guarantee" does not automatically create an express warranty, and concluded that the rider was not an express warranty but simply another condition or

---

**5.** We note that the definition of warranty given to the jury in Bell, which was based on the UCC definition, is almost identical to the definition given to the jury in the present case.

covenant of the lease agreement. *Id.* at 831–32.

In deciding whether a plaintiff's claim amounts to no more than a breach of contract, the court must determine whether: (1) the claim is for breach of a duty created solely by contract rather than a duty otherwise imposed by law; and (2) the injury is only the economic loss to the subject matter of the contract itself. *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex.1991). Recently, the Texas Supreme Court clarified the distinction between a breach of contract and a false, misleading or deceptive act or practice under the DTPA. *Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12 (Tex.1996)(per curiam). In *Crawford,* a sales representative for the Yellow Pages made several statements to the president of Ace Sign during negotiations to renew the company's ad. Specifically Crawford, the representative, stated that: (1) businesses like Ace Sign depend heavily on exposure in the Yellow Pages, and Ace Sign could expect its business to grow at least seventy to eighty percent during the next year with an advertisement; (2) Ace Sign would have to pay for the next year up front because it had fallen behind on its previous payments; and (3) if Ace Sign paid the full price up front, its advertisement would appear in the Beaumont, Port Arthur, and Mid–County directories in 1989–90. The parties entered into a written contract but, even though Ace Sign paid the full price up front, the ad did not appear in the 1989–90 directories. Ace Sign sued the representative and Southwestern Bell for breach of contract, negligence and violations of the DTPA. *Id.* at 13. The supreme court, citing *DeLanney* and a long line of similar cases, held that the representative's statements "were nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of that duty sounds only in contract." *Id.* at 13–14. The court stated:

> The statements themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and the injury

is governed by contract law, not the DTPA.

*Id.* at 14–15.

In determining whether the Bank breached an express warranty or merely committed a breach of contract, we must look at the language relating to the Bank's policy regarding proof of authority to act for a corporation. First, the Bank reserved the right to require DCV to provide a separate authorization telling the Bank who is authorized to act on its behalf. The Bank then affirmed that it would "honor such an authorization until we actually receive written notice of a change from the governing body." The Bank in fact demanded such an authorization. DCV provided two resolutions to the Bank. One was very specific and provided that only Denson could take out loans on behalf of DCV. The other was much broader and described numerous actions that only Carr was authorized to take. James Smith testified that the purpose of these resolutions was to inform the Bank who was authorized to act on DCV's behalf. Bingman's name was not included on either resolution as a person authorized to act on DCV's behalf in any respect.

We find that the language relied upon by DCV as the basis for an express warranty did not relate to the character, quality, or title of the described banking services, but merely referred to the basis upon which the Bank agreed to determine who was authorized to act on the company's behalf. *Enterprise–Laredo,* 839 S.W.2d at 831. The duty to honor the company's resolution was created by the contract itself, and DCV's damages were for the economic loss caused by the Bank's failure to honor the resolution. *DeLanney,* 809 S.W.2d at 494–95. Therefore, we hold that the Bank's agreement to honor DCV's resolution regarding who was authorized to act on behalf of the company was simply another condition or covenant of the contractual agreement and was not an express warranty. *Enterprise–Laredo,* 839 S.W.2d at 832.

Points of error four, five and seven are sustained. Points of error six and eight do not need to be addressed as they relate to error involving the finding of an express warranty.

## Points of Error One, Two and Three

### (Statute of Limitations)

In its first three points of error, the Bank argues that DCV's DTPA claims are barred by the two-year statute of limitations and, therefore, the trial court erred in overruling the Bank's motions for judgment non obstante veredicto on that point.

The trial court entered judgment on the jury's finding of breach of express warranty under the DTPA, and directed a verdict on DCV's DTPA claim based upon breach of implied warranty. The jury answered "no" to all other questions submitted under the DTPA, which findings have not been challenged on appeal. Because we have determined that the trial court erred in entering judgment on the breach of express warranty finding and, as discussed later, that the court properly directed a verdict as to the DTPA implied warranty claim, there remain no DTPA findings upon which judgment could be entered. Therefore, it is unnecessary to address the Bank's limitations challenge to DCV's DTPA claims.

## Point of Error Nine

### (Comparative Responsibility)

In point of error nine, the Bank claims the trial court should have granted its motion for new trial because the jury's finding that DCV was only fifty percent negligent was factually insufficient. When reviewing a factual sufficiency challenge, we consider, weigh, and examine all of the evidence, and sustain the challenge only if the evidence is so weak as to render the jury's finding clearly wrong and manifestly unjust. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The appellate court is not a factfinder, and may not substitute its judgment for that of the jury, even if a different answer could be reached on the evidence. *St. Paul Medical Ctr. v. Cecil*, 842 S.W.2d 808, 813 (Tex.App.—Dallas 1992, no writ).

Jury question six asked the jury to determine the percentage of negligence, if any, attributable to the Bank and DCV. The jury found each party fifty percent responsible. The Bank points to two factors which it claims supports a finding that DCV was more than fifty percent negligent: (1) DCV's complete control over Bingman; and (2) DCV's failure to call the Bank and inquire when it noticed that cashier's checks had been issued in lieu of the checks payable to the Bank.

We have reviewed all of the evidence and find that it is sufficient to support the jury's finding that DCV and the Bank were equally negligent. Although DCV could have called the Bank to inquire about the cashier's checks, so could the Bank have called DCV to confirm Bingman's authority. The evidence shows Bingman initially presented several checks signed by Denson and payable to the Bank which were used to pay taxes. Without explanation, Bingman changed course and began to present checks signed by Denson and payable to the Bank, but requested issuance of cashier's checks payable to a third party. The jury could have found the Bank fifty percent negligent for failing to inquire as to Bingman's authority to direct DCV's funds in such a manner. Considering and weighing all of the evidence, we do not find the jury's answer to question six to be so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d at 176.

Point of error nine is overruled.

## Points of Error Ten, Eleven, and Twelve

### (Comparative Responsibility and Damages)

In points of error ten through twelve, the Bank argues that "if the judgment is affirmed on an express warranty theory, DCV's damages must be reduced at least by one-half (and probably more) because of the findings in Questions 4–5 ... that DCV's contributory negligence proximately caused at least 50% of its losses." The Bank claims this is necessary because "a general concept of comparative responsibility is part of the general law of 'warranty' and 'damages' imported into the DTPA." Clearly, the Bank's complaint is contingent upon affirmance of the breach of express warranty finding. Be-

cause we have reversed on that issue, it is unnecessary to address these points of error.

## Point of Error Thirteen

### (Failure to condition award of attorney's fees)

In point of error thirteen, the Bank claims the trial court erred in failing to condition the award of appellate attorney's fees on success of the appeal. A trial court may not penalize a party for taking a successful appeal. *Siegler v. Williams*, 658 S.W.2d 236, 241 (Tex.App.—Houston [1st Dist.] 1983, no writ). An unconditional award of attorney's fees is improper. *Sipco Serv. Marine v. Wyatt Field Serv.*, 857 S.W.2d 602, 608 (Tex.App.—Houston [1st Dist.] 1993, no writ). However, in the present case the error is harmless because, although we have sustained the Bank's contention regarding the trial court's judgment on the express warranties, the Bank, as discussed later under DCV's conditional assignments, has been ultimately unsuccessful in this appeal. Therefore, we find no reversible error in the trial court's failure to condition the award of appellate attorney's fees on DCV's success in this court. However, the point of error is sustained to the extent it applies to the unconditional award of attorney's fees on appeal to the Texas Supreme Court. We order the trial court, when entering its new judgment, to provide that DCV is entitled to attorney's fees on appeal to the Texas Supreme Court only in the event the Bank's appeal is unsuccessful.

Point of error thirteen is overruled in part and sustained in part.

## Conditional Cross–Points One, Two, Eight, Nine, and Ten

### (Apparent Authority and Jury Findings of Negligence, Breach of Contract, and Conversion)

DCV raises eleven conditional cross-points in the event we reverse the trial court's judgment based upon breach of express warranty. Because we have reversed on that issue, we will address DCV's contentions as appropriate.

The jury found in favor of DCV not only on its claims for breach of express warranty, but also on its claims of negligence, breach of contract, and conversion. The Bank filed a motion requesting the trial court to disregard the jury findings on these issues. The Bank argued the answers to these questions were rendered immaterial by the jury's finding in question four that Bingman had apparent authority to direct the Bank to issue the cashier's checks and that the Bank acted in reliance thereon. The trial court granted the Bank's motion and disregarded the findings of negligence, breach of contract, and conversion as "immaterial" in light of the apparent authority finding. In conditional cross-points of error one, two, eight, nine, and ten, DCV argues the trial court erred in disregarding the jury's findings on these issues because the contract between DCV and the Bank precluded any finding of apparent authority. We agree.

DCV's depository contract with the Bank stated that with corporate, partnership, and other organizational accounts, the Bank reserved "the right to require the governing body of the legal entity to give us a separate authorization telling us who is authorized to act on its behalf." It further stated that the Bank would "honor such an authorization until we actually receive written notice of a change from the governing body." DCV had a corporate account and the Bank required DCV to file resolutions with the Bank. According to Bank vice-president James Smith, these resolutions were filed not just to inform the Bank as to who could sign on the account, but to inform the Bank as to who was authorized to act on behalf of the corporation.

DCV filed two resolutions with the Bank. The first, signed May 27, 1988, authorized Denson to borrow money from the Bank and to execute notes or other written obligations on behalf of DCV. The second resolution, signed April 5, 1988, was entitled "Resolution Authorizing The Signing Of Checks, Etc." It authorized Carr to "endorse and cash checks and drafts for and on behalf of" DCV. DCV argues that the resolutions precluded submission of the apparent authority issue as well as the jury's finding. DCV contends

there could be no apparent authority for Bingman's actions in obtaining the cashier's checks based on the resolutions. We agree and find that the second resolution authorizing only Carr to endorse and cash checks precluded any finding of apparent authority.

■ The general rule of principal-agent relations is that the agent's unauthorized actions do not bind the principal unless: (1) the principal ratifies those actions; or (2) something estops the principal from denying the authority of those actions. *Elliot Valve Repair v. B.J. Valve & Fitting*, 675 S.W.2d 555, 560–61 (Tex.App.—Houston [1st Dist.] 1984), *rev'd on other grounds*, 679 S.W.2d 1 (Tex.1984). The doctrine of apparent authority arises from the second of the categories in the general rule. *Id.* Apparent authority is the power of an agent to "affect the legal relations of another person by transactions with third persons." *Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex.1984) (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1958)). A principal, having given an agent the appearance of authority to do certain acts, cannot subsequently avoid liability for the agent's acts by alleging the agent lacked authority to do them. *Elliot Valve Repair*, 675 S.W.2d at 561 (citing *Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex.1975)).

■ Certain limitations apply in determining whether apparent authority exists. *Elliot Valve Repair*, 675 S.W.2d at 561. First, apparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority the agent purported to exercise. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex.1996); *Moody v. EMC Servs., Inc.*, 828 S.W.2d 237, 241 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Elliot Valve Repair*, 675 S.W.2d at 561 (citing *Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex.1981) and *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778–79 (Tex.1974)). Only the acts of the principal may be considered; representations made by the agent of his authority have no effect. *Elliot Valve Repair*, 675 S.W.2d at 561 (citing *Southwest Title Ins. Co. v. Northland Bldg. Corp.*, 552

S.W.2d 425, 428 (Tex.1977) and *Custom Leasing, Inc. v. Texas Bank and Trust Co. of Dallas*, 516 S.W.2d 138, 144 (Tex.1974)). Second, the principal must either have affirmatively held the agent out as possessing the authority or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized manner. *NationsBank*, 922 S.W.2d at 953; *Moody*, 828 S.W.2d at 241; *Elliot Valve Repair*, 675 S.W.2d at 561 (citing *Douglass*, 504 S.W.2d at 778–79). Finally, a party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, he does so at his own risk. *Elliot Valve Repair*, 675 S.W.2d at 561. We find that the resolutions, the transactions involved in this case, and the Bank's own actions preclude the Bank from relying on the apparent authority doctrine in this case.

■ At the Bank's request, DCV filed a corporate resolution identifying who was authorized to "endorse and cash checks" on its behalf. DCV's authorization was limited to Carr and conferred actual authority on Carr alone to endorse and cash checks. Actual authority is the authority that the principal intentionally confers upon an agent, intentionally allows an agent to believe he possesses, or by want of care allows an agent to believe he possesses. *Moody*, 828 S.W.2d at 241. The Bank argues that it complied with the resolution because Carr *did* endorse the checks. However, the resolution not only limits who can endorse checks, it also limits who can "cash checks."

■ A cashier's check is a bill of exchange drawn by a bank on itself and accepted in advance by the act of its issuance. *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 656 (Tex.1990); *Wertz v. Richardson Heights Bank and Trust*, 495 S.W.2d 572, 574 (Tex.1973). A cashier's check circulates through commerce as "the functional equivalent of cash." *Arline v. Omnibank, N.A.*, 894 S.W.2d 76, 82 (Tex.App.—Houston [14th Dist.] 1995, no writ). *See also Community Nat'l Bank v. Channelview Bank*, 814 S.W.2d 424, 427 (Tex.App.—Houston [1st Dist.] 1991, no writ)

(stating that cashier's check is equivalent of cash). When the Bank issued cashier's checks payable to Bingman's company, it was in effect cashing DCV's checks and dispersing the proceeds to Bingman.

█ Looking at DCV's actions and the Bank's actions, we find that the resolution precludes application of the apparent authority doctrine. *See Elliot Valve Repair*, 675 S.W.2d at 561. DCV's resolution expressly gave only Carr actual authority to endorse and cash checks on its behalf. The Bank knew about the resolution. When it failed to question Bingman's authority, the Bank put itself at risk. *Id.* Apparent authority is not available where the other contracting party has notice of the limitations of the agent's power. *Douglass*, 504 S.W.2d at 779. *See also Odstrcil v. McGlaun*, 230 S.W.2d 353, 355 (Tex.Civ.App.—Eastland 1950, no writ) (holding lease not binding on principal where agent's authority was limited by language in power of attorney and lessee had notice of terms of power of attorney).

The Bank required DCV to file the resolutions and knew that only Carr had authority to cash checks for the company. The Bank's claim of apparent authority cannot prevail. *See id.* We agree with DCV that the trial court erred in disregarding the jury findings on negligence, breach of contract, and conversion based on the apparent authority finding.

Conditional cross-points one, two, and eight through ten are sustained.

█ Although a party may assert any and all causes of action it may have against another, it will be limited to only one recovery of damages. *Electro Assocs., Inc. v. Harrop Constr. Co., Inc.*, 908 S.W.2d 21, 22 (Tex.App.—Houston [1st Dist.] 1995, writ denied). A party who seeks redress under two or more theories of recovery for a single wrong must, before judgment is rendered, elect the remedy it wishes the court to enter judgment upon. *Id.* A party is entitled to the greatest relief under any theory that the verdict will support. *Id.* We have found the trial court should not have disregarded the

jury findings on negligence, breach of contract, and conversion. Consequently, we must remand the cause to allow DCV to make an election and allow the trial court to enter judgment in accordance with that election.

### Conditional Cross–Points Three Through Seven

### (Jury Instructions)

Based on our holding regarding conditional cross-points one, two, and eight through ten, it is unnecessary to address conditional cross-points three through seven.

### Conditional Cross–Point Eleven

### (Breach of Implied Warranties)

█ In its final conditional cross-point, DCV contends the trial court erred in granting a directed verdict in favor of the Bank on claims under the DTPA for breach of implied warranties. DCV urges this court to extend the holding of *Melody Home Mfg. v. Barnes*, 741 S.W.2d 349, 353 (Tex.1987), and recognize an implied warranty to provide "reasonably proficient and safe and sound banking services."

█ The DTPA prohibits the breach of an express or implied warranty, but it does not create warranties. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex.1995). *See also* TEX. BUS. & COM.CODE ANN. § 17.50(a)(2) (Vernon Supp.1996). Actionable warranties under the DTPA must be recognized by the common law or created by statute. *Woodruff*, 901 S.W.2d at 438 (citing *La Sara Grain*, 673 S.W.2d at 565). Unlike the implied warranties imposed on certain sales transactions under the UCC, the implied service warranty is a purely common law creation.[6] *Woodruff*, 901 S.W.2d at 438 (citing *Melody Home*, 741 S.W.2d at 353 (stating that implied warranty arises by operation of law when public policy so mandates)). An implied warranty to provide "reasonably proficient and safe and sound banking services" is unknown in Texas jurisprudence. Thus, the question before us is

---

**6.** *See* TEX. BUS. & COM.CODE ANN. § 2.312 (warranty of title); § 2.314 (warranty of merchantability); and § 2.315 (warranty of fitness for a particular purpose).

whether we should recognize such an implied warranty under the facts of this case.

The judicial recognition of implied warranties in service transactions has had a short and "uneven" history in Texas. *Woodruff,* 901 S.W.2d at 438. Until 1987, the Texas Supreme Court had never recognized a cause of action for breach of an implied warranty relating to services. *Id. See also Melody Home,* 741 S.W.2d at 354. Two years before *Melody Home,* the supreme court declined to recognize an implied warranty in connection with medical services when a patient was sexually assaulted and beaten by her psychiatrist. *See Dennis v. Allison,* 698 S.W.2d 94 (Tex.1985). The court, in refusing to recognize the implied warranty in *Dennis,* concluded that it was not necessary to impose an implied warranty theory as a matter of public policy because the plaintiff-patient had other adequate remedies to redress the wrongs committed during her treatment. 698 S.W.2d at 96. When the court did recognize an implied warranty two years later in *Melody Home,* it approved a limited implied warranty to "repair or modify existing tangible goods or property in a good and workmanlike manner." 741 S.W.2d at 354. However, in *Melody Home,* the court did not retreat from its holding in *Dennis. Woodruff,* 901 S.W.2d at 439.

Before a court may judicially impose a new implied warranty, two factors must be considered: (1) there must be a demonstrated need for the warranty, i.e., the plaintiff must be without adequate remedies to redress the alleged wrong; and (2) the implied warranty should extend only to services provided to remedy defects existing at the time of the relevant consumer transaction. *Id.* Without reaching the second question, we find that DCV has adequate remedies to redress the alleged wrong. Under the facts of this case, DCV has not demonstrated a need for this court to imply a warranty of "reasonably proficient and safe and sound banking services."

DCV has neither argued, nor proven, that damages for its claims of negligence, breach of contract, or conversion, would not provide an adequate remedy to redress the wrongs committed by the Bank. *See Dennis,* 698

S.W.2d at 96. We decline to recognize an implied warranty of "reasonably proficient and safe and sound banking services" as requested by DCV. The trial court did not err in directing a verdict in favor of the Bank on the breach of implied warranty claim.

Conditional cross-point eleven is overruled.

### Cross-Point One

### (Prejudgment Interest)

In this cross-point, DCV contends the trial court erred by awarding DCV prejudgment interest at a rate of six percent simple interest. DCV argues it was entitled to interest at a rate of ten percent compounded daily. We have remanded this case to allow DCV to make an election of remedies and for the trial court to enter a new judgment based on that election. Therefore, it is unnecessary to address DCV's contention on pre-judgment interest. We trust the trial court will award pre-judgment interest at the appropriate rate in accordance with the election by DCV.

### Conclusion

The judgment of the trial court is reversed and we remand to the trial court for further action in accordance with this opinion.